UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| EDWARD J. SCOTT, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil No. 05-81-P-C |
| | ) |
| SHERIFF COTE and | ) |
| MICHAEL VITIELLO, | ) |
| | ) |
| Defendants | ) |

### *Recommended Decision on Motion for Summary Judgment*

Edward Scott, through counsel, brings this 42 U.S.C. § 1983 action alleging that his right to be free from cruel and unusual punishment as a pre-trial detainee was infringed by two defendants – York County Sheriff Philip Cote and York County Jail Administrator Michael Vitiello – when jail personnel were deliberately indifferent to his physical and mental health in three respects. One, Scott claims that he was placed in a cell that was contaminated by another inmate's blood and made to clean the blood up without protective clothing. Two, Scott asserts that the jail staff did not protect him from an assault by a fellow inmate. And, three, Scott complains that jail personnel did not provide him with adequate mental health care apropos his schizoaffective bipolar disorder. Cote and Vitiello have moved for summary judgment (Docket No.19) and I recommend that the Court grant their motion.

### *The Summary Judgment Record*

#### *The Standard*

The following statement of facts is drawn from the parties' statements of material fact in accordance with this District's summary judgment practice. See Dist. Me. Loc. R.

56; Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co. Am., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining the "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes generated by the parties' statements have been resolved in favor of Scott. See Merchs. Ins. Co. N.H. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). The defendants' motion should be granted because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ...[they are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)

*The Facts*

There is no dispute that in June of 2003, Edward Scott was incarcerated for two days in the York County Jail. (Defs.' SMF ¶ 1; Pl.'s Resp. SMF ¶ 1.) Scott returned to the York County Jail on July 22, 2003, and has remained in the jail continuously since that time. (Defs.' SMF ¶ 2; Pl.'s Resp. SMF ¶ 2.) He is a pretrial detainee awaiting trial. (Defs.' SMF ¶ 3; Pl.'s Resp. SMF ¶ 3.) Scott has been an inmate at the York County Jail for more than two years. (Pl.'s SAMF ¶ 1; Defs.' Resp. SAMF ¶ 1.)

*Exposure to blood*

In April of 2004, Scott was ordered by Lieutenant Dubois (who is not named as a defendant) to change cells. (Defs.' SMF ¶ 4; Pl.'s Resp. SMF ¶ 4.) When Scott moved to his new cell, he discovered that there was blood on the toilet, sink, walls, and there was a blood stained shirt on the floor. (Defs.' SMF ¶ 5; Pl.'s Resp. SMF ¶ 5.) Dubois, or other correctional staff (who are also not named as defendants), made Scott clean the blood out

of the cell. (Defs.' SMF ¶ 6; Pl.'s Resp. SMF ¶ 6.) When Dubois asked Scott to clean the blood out of the cell, Scott was given glass cleaner and paper towels to do the cleaning. (Defs.' SMF ¶ 7; Pl.'s Resp. SMF ¶ 7.) Scott cleaned the cell and after that he was able to live in the cell. (Defs.' SMF ¶ 8; Pl.'s Resp. SMF ¶ 8.)

At the time that he was ordered to clean the bloody cell, Scott was on suicide watch. (Pl.'s SAMF ¶ 31; Defs.' Resp. SAMF ¶ 31.) Scott was given absolutely no protective gear to use while cleaning the cell, only glass cleaner and paper towels. (Pl.'s SAMF ¶ 32; Defs.' Resp. SAMF ¶ 32.) The officer did not even provide him with rubber gloves. (Pl.'s SAMF ¶ 33; Defs.' Resp. SAMF ¶ 33.) He was required to clean blood on the toilet, on the sink, on the walls and remove a blood stained shirt that was on the floor. (Pl.'s SAMF ¶ 34; Defs.' Resp. SAMF ¶ 34.)[1]

According to the defendants Scott did not contract any disease or illness a result of his exposure to the blood in the cell and the only injury he claims to have sustained are emotional injuries; in other words, he has no physical injuries to accompany his claim for emotional injuries regarding the exposure to blood. (Defs.' SMF ¶¶ 9 -11.) According to Scott he is not aware as to whether or not he contracted any diseases or illnesses from the blood in the cell. (Pl.'s Resp. SMF ¶¶ 9-11.)

### *Assault by another inmate*

In January of 2005, Scott claims that an inmate named Mark Murphy came into his cell and assaulted him. (Defs.' SMF ¶ 12; Pl.'s Resp. SMF ¶ 12.) At the time the assault occurred Scott was housed in the segregation unit of the jail. (Defs.' SMF ¶ 13;

---

[1] The defendants qualify these preceding three statements by interjecting: "According to Scott this is what transpired." (Defs.' Resp. SAMF ¶¶ 32, 33, 44.) However, the defendants would need record evidence to controvert these statements and if these assertions were not true these defendants could have at least generated a genuine dispute by providing competing evidence, such as deposition testimony or jail records.

Pl.'s Resp. SMF ¶ 13.)  Although it is not a written rule, inmates are made aware, and most inmates understand, that it is a jail rule that they cannot go into other inmates' cells. (Defs.' SMF ¶ 14; Pl.'s Resp. SMF ¶ 14.)  Michael Vitiello was not in Scott's cell block when Scott was assaulted.  (Defs.' SMF ¶ 15; Pl.'s Resp. SMF ¶ 15.) Philip Cote was not in Scott's s cell block when he was assaulted. (Defs.' SMF ¶ 16; Pl.'s Resp. SMF ¶ 16.) Scott does not believe that either Vitiello or Cote knew that inmate Mark Murphy was going to enter Scott's cell and assault him prior to the assault taking place.  (Defs.' SMF ¶ 17; Pl.'s Resp. SMF ¶ 17.)

According to Scott, prison officials knew of more than one prior episode of violence against and involving Scott. (Pl.'s SAMF ¶ 13; Pl.'s Exs. 9, 10, 11, 12, 13.)  He asserts that he was a target of other inmates, was repeatedly referred to as a "skinner" (a term used by inmates to refer to those charged with sex crimes against children), received threats against his life and his family, and was repeatedly involved in episodes of violence.  (Pl.'s SAMF ¶ 14; Pl.'s Exs. 9, 10, 11, 12, 13.)  Scott represents that there is "clear evidence" that Vitiello was aware of the repeated episodes of violence as indicated by his review and approval of administrative action concerning the events of violence against Scott, as well as evidence that he reviewed inmate grievances filed by Scott throughout Scott's stay at the jail. (Pl.'s SAMF ¶ 15; Pl.'s Exs. 8 & 13.)  Scott maintains that it is "evident" that his role as the jail administrator required Vitiello to be made aware of significant acts of violence, including those against Scott prior to the assault in question.  (Pl.'s SAMF ¶ 16; Pl.'s Exs. 8 & 13.)  Specifically, Vitiello was aware that on February 20, 2004, two brothers threatened Scott's life and one of the brothers entered Scott's cell and assaulted him. (Pl.'s SAMF ¶ 17; Pl.'s Exs.12 & 13.)  He states that on

February 22, 2004, the same inmate began threatening Scott, threatened to rape his wife, and another assault occurred. (Pl.'s SAMF ¶ 18; Exs. 10, 11, 12, 13.) Scott asserts that prior to this assault, the defendants "were well aware" of the constant taunting, threats of violence and name calling by other inmates, as well as several prior assaults against Scott. (Pl.'s SAMF ¶ 28; Pl.'s Exs. 9, 10, 11, 12, 13, 14.) [2]

The defendants respond that only the officers writing the reports cited by Scott (and presumably those noted as witnesses to those incidents) had information about episodes of violence involving Scott. (Defs.' Resp. SAMF ¶ 13.) They also contend that the reports identified relate solely to a single incident on February 22, 2004, in which an inmate named Chase Belafontane called Scott a skinner and Scott attacked Belafontane. (Defs.' Resp. SAMF ¶ 14). However, one of the reports cited by Scott does pertain to a violent incident between Scott and another inmate on August 17, 2003 (Pl.'s Ex. 9). With respect to Vitiello's awareness of "repeated episodes of violence" the defendants state, correctly, that Exhibit 8 is evidence of nothing other than that Vitiello signed a grievance on November 2, 2003, with no evidence that it was a grievance authored by Scott, let alone one concerning a violent incident. (Defs.' Resp. SAMF ¶¶ 15 & 16.) They also argue that Exhibit 13 only evidences that Vitiello reviewed and approved the disciplinary committee's recommendation finding Scott guilty of assaulting another inmate (as opposed to being assaulted by another inmate) apropos the February 22, 2004, incident, whereas in this action Scott is complaining about a January 2005 incident. (Defs.' Resp. SAMF ¶ 15 &17.)

---

[2] The defendants "deny" this contention by pointing to the fact that Vitiello had signed a disciplinary recommendation for the February 22, 2004, incident. (Defs.' Resp. SAMF ¶ 28; Pl.'s Ex. 13.)

There is no dispute that the report of the investigating officer, Officer Daigneault, was forwarded to the disciplinary committee, which included final review and authorization by Vitiello. (Pl.'s SAMF ¶ 19; Defs.' Resp. SAMF ¶ 19; Pl.'s Exs. 12 & 13.) During the disciplinary proceeding, Scott informed the committee that the whole housing unit where he was housed had been taunting him for the entire week prior. (Pl.'s SAMF ¶ 20; Defs.' Resp. SAMF ¶ 20; Pl.'s Ex. 13.) Vitiello reviewed the information on March 19, 2004. (Pl.'s SAMF ¶ 21; Defs.' Resp. SAMF ¶ 21; Pl.'s Ex. 13.)

There is also no dispute that in November of 2004, Scott became severely depressed and suicidal. (Pl.'s SAMF ¶ 22; Defs.' Resp. SAMF ¶ 22; Pl.'s Exs. 5, 6, 7.) According to Scott, he informed members of the medical staff that his depression and mental health issues were due in part to other inmates continuing to harass and threaten him. (Pl.'s SAMF ¶ 23; Pl.'s Ex. 14.) The defendants respond that the cited progress supports the assertion that Scott told health care personnel that other inmates and some guards were giving him a difficult time due to his charges but not that Scott had told the providers that this was a cause of his depression and mental health issues. (Defs.' Resp. SAMF ¶ 23.)

According to Scott, during this time, he also stopped taking his medications for a period of four to five months because he was being required to come out of his cell to get the medications from the medical cart and because when he did so he was exposed to other inmates that had threatened him with violence. (Pl.'s SAMF ¶ 24.) The defendants qualify by noting that they are not personally familiar with the reasons why Scott stopped his medication but point out that Scott told the mental health care provider on November 18, 2004, that he did so because he did not want to meet with the psychiatric nurse

6

practitioner. (Defs.' Resp. SAMF ¶ 24; Pl.'s Ex. 14.) There is no dispute that, despite Scott's request that medication be given to him in his cell to avoid exposure to physical harm, he was still required to get his medication outside of his cell. (Pl.'s SAMF ¶ 25; Defs.' Resp. SAMF ¶ 25.)[3]

With respect to the injuries sustained, the jail's progress note regarding the medical treatment for the January 2005 assault, indicates:

> Mr. Scott was assaulted by another I/M in his own cell. He sustained bruises to his forehead, [right] cheek, in front of [left] ear area ½" long, his nose bled and is sore but appears straight. He was taken to have pictures taken and then given ice packs to help reduce the swelling. He states nothing else hurts.

(Pl.'s Ex. 15; see also Pl.'s SAMF ¶ 27; Defs.' Resp. SAMF ¶ 27.)

*Medical care*

There is no dispute about the following facts pertinent to Scott's denial of medical care claim. Scott has been diagnosed as having a mental health condition called schizoaffective bipolar. (Defs.' SMF ¶ 18; Pl.'s Resp. SMF ¶ 18.) Prior to arriving at the York County Jail in July of 2003, Scott had not been prescribed medications to treat his schizoaffective bipolar condition. (Defs.' SMF ¶ 19; Pl.'s Resp. SMF ¶ 19.) Scott was prescribed medications while incarcerated in the jail to treat his schizoaffective bipolar condition. (Defs.' SMF ¶ 20; Pl.'s Resp. SMF ¶ 20.) Scott was initially prescribed Lexipro, which he took for a couple of months (Defs.' SMF ¶ 21; Pl.'s Resp. SMF ¶ 21) and then stopped taking the Lexipro. (Defs.' SMF ¶ 22; Pl.'s Resp. SMF ¶ 22).[4] In

---

[3] Scott proffers the following statement of fact which I disregard because it is a legal conclusion: "Due to the deliberate indifference of Defendants, on January 9, 2005, Plaintiff was again subjected to a violent assault in his own cell." (Pl.'s SAMF ¶ 26.)

[4] The defendants assert that it was Scott's decision to stop taking this medication but, as Scott points out, the portion of Scott's deposition upon which they rely does not support this contention.

November of 2004, Scott was prescribed Risperdal and Zoloft, which he has continued to take since November of 2004. (Defs.' SMF ¶ 23; Pl.'s Resp. SMF ¶ 23.)

Scott was/has been seen off and on the entire time he has been incarcerated in the jail by a mental health care provider. (Defs.' SMF ¶ 24; Pl.'s Resp. SMF ¶ 24.) Scott believes that after his initial mental health care assessment in August of 2003 he should have been placed on medications; however, he acknowledges that he had not been placed on mental health care medications by his outside provider prior to entering the jail. (Defs.' SMF ¶ 25; Pl.'s Resp. SMF ¶ 25.) Scott also believes that the jail should have made more immediate arrangements to have him sent out for an outside psychological evaluation, but his did not happen until two years had elapsed. (Defs.' SMF ¶ 26; Pl.'s Resp. SMF ¶ 26.) The outside psychological evaluation that was performed on Scott was done in part to determine competency in his criminal case. (Defs.' SMF ¶ 27; Pl.'s Resp. SMF ¶ 27.)[5]

Scott acknowledges that he was being seen for his mental health care issues while incarcerated in the jail. (Defs.' SMF ¶ 28; Pl.'s Resp. SMF ¶ 28.) Although Scott acknowledges receiving some treatment, he does not agree that it was the right treatment. (Defs.' SMF ¶ 29; Pl.'s Resp. SMF ¶ 29.)

In his statement of additional facts, Scott contends that, from very early during his stay, his significant need for mental health treatment was recognized by staff at the jail and he cites his Exhibits 1, 2, and 4. (Pl.'s SAMF ¶ 2.) The defendants respond that Exhibit 1 identifies that Scott wanted to see the jail's mental health provider on August 11, 2003; his Exhibit 2 identifies that Scott was seen on August 13, 2003, and given an

---

[5] The defendants do not state that the evaluation was done "in part" to determine competency but the Scott deposition supports this qualification offered by Scott.

assessment which identified extreme anger issues and sexual urges that were uncontrollable; and his Exhibit 4 is a Crisis Response Services record dated February 17, 2004, which provides recommendations for a psychiatric evaluation as soon as possible, closest level of supervision, and anger management. (Defs.' Resp. SMF ¶ 2.) According to the defendants these three exhibits do not identify whether Scott's need for mental health care treatment is "significant," nor do they identify knowledge possessed by non-medical jail staff, to the extent that Scott's averment is intended to be directed at corrections officers or Vitiello as jail administrator. (Id.)

There is no dispute that in January of 2004 jail staff observed that Scott had set up a sheet in his cell in such a manner as to make a suicide attempt. (Pl.'s SAMF ¶ 3; Defs.' Resp. SAMF ¶ 3.) All of the linens were removed from Scott's cell and he was placed in a protective blue suicide gown and placed on suicide watch. (Pl.'s SAMF ¶ 4; Defs.' Resp. SAMF ¶ 4.)  In February of 2004, Scott was seen by Crisis Response Services at the jail for a crisis assessment. (Pl.'s SAMF ¶ 5; Defs.' Resp. SAMF ¶ 5.)  At that time, the Crisis Response Services recommended that Scott be under the highest level of supervision possible and that he be sent for a psychological evaluation as soon as possible (Pl.'s SAMF ¶ 6; Defs.' Resp. SAMF ¶ 6), presumably, Scott speculates, to assist the jail in treating and meeting Scott's significant mental health needs. (Pl.'s SAMF ¶ 6). According to Scott -- relying on his own deposition -- despite this significant recommendation, and later similar recommendations, no such evaluation was ever scheduled or set up by the jail and was only scheduled through the court and Scott's attorney sometime in mid 2005, over a year later. (Pl.'s SAMF ¶ 7.) Pointing to the record of the August 13, 2003, evaluation of Scott in which the health care provider recommended a court ordered

9

psychiatric evaluation, defendants respond that there is no record evidence that the jail had the power to expedite his competency hearing or the legal process. (Defs.' Resp. SAMF ¶ 7; Pl.'s Ex. 2.)

There is no dispute that in November of 2004, jail records indicate, Scott was extremely suicidal (Pl.'s SAMF ¶¶ 8, 22; Defs.' Resp. SAMF ¶¶ 8, 22; Pl.'s Exs.5, 6, 7) and that it was likely that he was having a nervous breakdown. (Pl.'s SAMF ¶ 8; Defs.' Resp. SAMF ¶ 8). In that same month, a member of the medical staff expressed concern regarding Scott's significant depressive state and the likelihood that he would attempt suicide. (Pl.'s SAMF ¶ 9; Defs.' Resp. SAMF ¶ 9.) His mental health issues were so severe that there was concern that he could not be trusted alone and that he presented a danger to the medical staff. (Pl.'s SAMF ¶ 10; Defs.' Resp. SAMF ¶ 10.) A member of the medical staff again recommended that a psychological evaluation should be ordered by the court. (Pl.'s SAMF ¶ 11; Defs.' Resp. SAMF ¶ 11; Pl.'s Ex. 7.)

### *Scott's administrative grievances*[6]

Scott never wrote to Michael Vitiello about not receiving appropriate medical treatment. (Defs.' SMF ¶ 30; Pl.'s Resp. SMF ¶ 30.) He never wrote to Sheriff Philip Cote regarding not receiving appropriate medical treatment. (Defs.' SMF ¶ 31; Pl.'s Resp. SMF ¶ 31.) He never spoke with Vitiello regarding the medical treatment he was receiving at the York County Jail. (Defs.' SMF ¶ 32; Pl.'s Resp. SMF ¶ 32.) He never spoke with Cote regarding the medical treatment he was receiving at the York County Jail. (Defs.' SMF ¶ 33; Pl.'s Resp. SMF ¶ 33.)

---

[6]   The defendants do not press an argument in their summary judgment memorandum or reply memorandum that Scott did not fully exhaust his administrative remedies as required under 42 U.S.C. § 1997e(a), but instead set forth these facts in support of their claim that Cote and Vitiello were not sufficiently apprised of the facts underpinning Scott's three claims to justify holding them liable as supervisors.

Scott never spoke to Vitiello regarding the cell with blood in it. (Defs.' SMF ¶ 34; Pl.'s Resp. SMF ¶ 34.) He never wrote to Vitiello regarding the cell with blood in it. (Defs.' SMF ¶ 35; Pl.'s Resp. SMF ¶ 35.)  He never talked to Cote regarding the jail cell with blood in it.  (Defs.' SMF ¶ 36; Pl.'s Resp. SMF ¶ 36.)  He never wrote to Cote regarding the jail cell with blood in it. (Defs.' SMF ¶ 37; Pl.'s Resp. SMF ¶ 37.)  With respect to the cell blood contamination incident Scott filed a grievance dated April 13, 2004 -- in which he indicates that he anticipates that it "will effect [his] well being" and that "it isn't healthy for [his] well being" -- and Scott presumes that Vitiello reviewed this grievance "based on the records and procedure of the facility." (Pl.'s SAMF ¶¶ 35 & 36; Pl.'s Ex. 16.)  The defendants point out the grievance form demonstrates only that it was received and answered by Corporal Sean Valliere not Vitiello.  (Defs.' Resp. SAMF ¶¶ 35 & 36.)  Despite his complaints, Scott protests, nothing was done to address the issue. (Pl.'s SAMF ¶ 37.)  The defendants respond that the record is that the cell was decontaminated and that it had been determined that Scott had to remain in maximum security despite Scott's complaints about being around people that cut themselves and having to clean the blood and that Scott would have to wait sixty days to seek reclassification since he did not appeal the initial classification decision.  (Defs.' Resp. SAMF ¶ 37; Pl.'s Ex. 17.)

According to Scott, the records indicate that Vitiello reviewed and signed off on "many" of Scott's grievances.  (Pl.'s SAMF ¶¶ 12 & 29.)  However, as the defendants point out (Defs.' Resp SAMF ¶¶ 12 & 29), Scott cites only to his Exhibit 8 which is a grievance form signed by Vitiello on November 12, 2003; neither the nature of the grievance nor the identity of the inmate grieving is disclosed.  Scott also asserts – without

11

any independent record evidence -- that he followed the policy regarding grievances concerning his safety at the jail, of which Vitiello possessed knowledge due to his review and acceptance of each grievance. (Pl.'s SAMF ¶ 30; Scott Dep. at 44.) At the cited portion of his deposition Scott indicates that he was aware of the inmate grievance process and responded "Yes." when asked whether he felt like he complied with that. (Scott Dep. at 44.)

## *Discussion*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.[7] In Farmer v. Brennan the United States Supreme Court explained apropos this genre of claim brought by inmates:

> The Constitution "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," Helling [v. McKinney], 509 U.S. [25,] 31 [(1993)]. In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. See Hudson v. McMillian, 503 U.S. 1 (1992). The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates," Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

511 U.S. 825, 832-33 (1994).

"[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

---

[7] Scott does not contest the defendants' argument, set forth in the third footnote of their summary judgment memorandum, that the deliberate indifference standard of the Eighth Amendment, as articulated in Farmer, is applicable to his claims arising from his pre-trial detention (as opposed to the due process principles articulated in Bell v. Wolfish, 441 U.S. 520 (1979)).

12

Id. at 847.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

Although the defendants covered their bases and briefed the issues surrounding official capacity claims, it is clear from Scott's response to the summary judgment that he is not trying to hold these defendants liable in their official capacity.  Certainly, Scott has not introduced factual statements to support a claim that there was a custom or policy responsible for the alleged Eighth Amendment violations.

It is also clear from Scott's response to the motion for summary judgment that Scott does not have evidence that either defendant was directly involved in the circumstances of his three claims, in the sense that they were on the ground floor calling the shots.  With respect to claims against these two defendants as supervisors:

> Supervisory liability under 42 U.S.C. § 1983 cannot be predicated on a respondeat superior theory, Hegarty [v. Somerset County], 53 F.3d [1379,] 1367 [(1st Cir. 1995)], but " 'only on the basis of [the supervisor's] own acts or omissions[,]' " Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir.1989)) (alteration in original). As we pointed out almost a decade ago, a supervisor:
>> can be held liable ... if (1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was "affirmative[ly] link[ed]" to that behavior in that it could be characterized as "supervisory encouragement, condonation or acquiescence" or "gross negligence amounting to deliberate indifference."
>
> Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir.1988) (citations omitted). Moreover, the indifference required to support supervisory liability under section 1983 must be "deliberate, reckless or callous." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir.1989). Thus, the "affirmative link" required between the action or inaction of a supervisor and the behavior of subordinates "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." Hegarty, 53 F.3d at 1380.

Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997).

*Sheriff Cote*

Sheriff Cote is entitled to summary judgment as to all three claims as there is not a single factual statement propounded by either side that links him to the events of which Scott complains, either in terms of interacting with Scott or as a supervisor vis-à-vis the decisions made regarding Scott. Indeed, in his opposition memorandum addressing each of his three claims, Scott does not even attempt to demonstrate that Cote had actual or presumptive knowledge of the circumstances underlying any of Scott's claims; forced by this motion to cut to the chase, Scott focuses solely on Vitiello in his attempt to make the supervisory liability link.

*Administrator Vitiello*

*Exposure to blood*

With respect to the exposure to blood claim the defendants first assert that 42 U.S.C. § 1997e(e) bars the claim. That provision of the Prison Litigation Reform Act provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Scott contends that this provision does not necessarily bar claims for punitive or nominal damages.

Assuming (without deciding) that Scott is right on that point, his claim fails against Vitiello because, even assuming that Vitiello had learned of the cell condition through a grievance process, there is no factual basis for the proposition that Vitiello had any direct or supervisory involvement in moving Scott to the cell or requiring him to clean the blood without protective clothing and gloves. This was a one-time occurrence

14

(as opposed to a continuing condition) and, at best, Vitiello learned of the situation after the fact and there was nothing he could have done at that point to have prevented the conduct by the officers involved. Once again, a 42 U.S.C. § 1983 plaintiff cannot hold a defendant liable on a respondeat superior theory.[8]

### *The January 2005 assault*

Addressing a claim very similar to this claim by Scott, the Eleventh Circuit summarized the Eighth Amendment standard for inmate failure to protect claims in the context of summary judgment:

> "'[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" Farmer, 511 U.S. at 833, 114 S.Ct. at 1976. (quotations and citations omitted). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." Id. at 834.
> "An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk'...." Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir.2001)(en banc), quoting Farmer, 511 U.S. at 844. "[T]o survive summary judgment on his section 1983, Eighth Amendment claim, [Plaintiff] was required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir.1995).
> ...To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a ' "sufficiently culpable state of mind." ' " Farmer, 511 U.S. at 834-38; Wilson v. Seiter, 501 U.S. 294, 299 (1991).

Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003). The Panel stressed that at the summary judgment stage the plaintiff must generate sufficient evidence to establish the defendants' subjective awareness. Id. It also noted that a generalized awareness of risk does not satisfy the subjective awareness requirement. Id. at 1350.

---

[8] Scott's grievances following this incident did articulate a concern about future exposure to inmates that cut themselves but there is no evidence in this record that his fears were realized.

First, the facts set forth above establish that Scott does not believe that either Vitiello (or Cote) knew that inmate Mark Murphy was going to enter Scott's cell and assault him prior to the assault taking place. (Defs.' SMF ¶ 17; Pl.'s Resp. SMF ¶ 17.) The record evidence which Scott relies on are chiefly reports relating only to a single incident on February 22, 2004, in which an inmate Belafontane called Scott a skinner and Scott attacked Belafontane. Exhibit 13 only evidences that Vitiello reviewed and approved the disciplinary committee's recommendation finding Scott guilty of assaulting another inmate (as opposed to being assaulted by another inmate) apropos the February 22, 2004, incident. Another of the reports cited by Scott does pertain to a violent incident between Scott and another inmate on August 17, 2003. And, once again, Exhibit 8 is evidence of nothing other than that Vitiello signed a grievance on November 2, 2003, with no evidence that it was a grievance by Scott, let alone one concerning a violent incident. There is no record evidence that Vitiello (or any jail staff under his direct supervision) had any knowledge of Scott's complaints to health care personnel that Scott was concerned about attacks by other inmates or that Vitiello knew before the disciplinary hearing that Scott claimed that fellow inmates had been taunting him for a week before the incident. In fact, other than these generalized apprehensions, Scott does not even establish that he personally anticipated the January 2005 attack.

Based on the summary judgment record before the court, Scott's history of confrontation with other inmates is much too attenuated to put Vitiello on notice as jail administrator that there was a risk of an attack on Scott in January 2005 by an inmate that had no history of confrontation with Scott. (Indeed, on this record it appears that the last Vitiello knew of the situation apropos these confrontations was that Scott admitted to

16

being the aggressor during the February 22, 2004, incident and admitted to "going off." (Pl.'s Ex. 13).)  The evidentiary support Scott is able to spin for this claim is too thin a thread with which to tag Vitiello with supervisory liability for an Eighth Amendment violation by jail personnel under his supervision.

### *Medical care*

Estelle v. Gamble provides that the Eighth Amendment protection places upon the government an "obligation to provide medical care for those whom it is punishing by incarceration."  429 U.S. 97, 103, 97 (1976). The Supreme Court observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Id.; see also Helling, 509 U.S. at 32  ("[T]he substantive limits on state action set by the Eighth Amendment," when it "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs" including food and medical care).

In responding to the defendants' motion for summary judgment and the record evidence, Scott focuses in on Scott's January 2004 suicide attempt, the indications by medical personnel in February 2004 that Scott should get a psychological evaluation, the failure of "the jail" to set up an evaluation independent of a court order, and the deterioration of Scott's condition to the point that, by November 2004, the medical staff considered him extremely suicidal and indicated that a psychological evaluation should be ordered by the court.  (Opp'n Mot. Summ. J. at 4-5.)

With respect to the question of whether there was an underlying Eighth Amendment violation by jail personnel (over whom Vitiello may or may not have had supervisory responsibilities) at the summary judgment stage of this litigation Scott cannot

17

rely on mere speculation that the failure to get an outside psychological evaluation caused him harm. See Walker v. Peters, 233 F.3d 494, 502 (7th Cir. 2000) (explaining that plaintiff must have evidence that demonstrate that he was actually injured by the denial of care); id. at 501 ("No reasonable jury could conclude based on [plaintiff's] personal testimony that his medical treatment was inadequate without any competent evidence in the record to support these claims."). Scott has not even put into the record the outcome of his psychological examination that apparently was completed per court order two years after he commenced his detainment. For this and other reasons,[9] I see significant difficulties in Scott's necessary showing that there was an underlying Eighth Amendment violation apropos the provision of mental health care to Scott at the jail.

That question aside, the defendants are entitled to summary judgment on the grounds that there is an insufficient affirmative link between Vitiello and the alleged deficiencies in the care provided. Although Scott asserts that Vitiello reviewed and signed off on many, if not all of, Scott's grievances making Vitiello aware of Scott's significant concerns regarding his medical treatment (Opp'n Mot. Summ. J. at 5), as set forth above, there is simply no cognizable record support for this contention.

### *Conclusion*

As discussed above, it is my recommendation that the Court **GRANT** this motion for summary judgment (Docket No. 19).

### NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) (1993) for which *de novo*

---

[9] The defendants make a persuasive argument that the facts support only a conclusion that Scott disagrees with the course of treatment provided by the jail staff, not that the treatment that he was provided was constitutionally inadequate.

18

review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

April 18, 2006                    /s/ Margaret J. Kravchuk
                                  U.S. Magistrate Judge